IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


CLIFFORD S. SHEPHERD,

         Plaintiff,                  CV 12-0351 WPL/CG

vs.

PRECISION DRILLING
COMPANY, L.P.,

         Defendant.

## DECISION

I have considered the evidence presented on May 20-22, 2013, together with the Proposed Findings of Fact and Conclusions of Law and trial briefs submitted by the parties, and enter the following Findings of Fact and Conclusions of Law to resolve all issues presented by the parties:

### FINDINGS OF FACT

1.     Clifford Shepherd has sued Precision Drilling, claiming that he was racially discriminated against and subject to a hostile work environment while working on Rig 194. Shepherd applied to work on July 1, 2010, and he was hired to work as a Floor Hand beginning on August 13, 2010. At that time, Precision Drilling notified Shepherd of its Equal Opportunity Employer status and policy. It also notified Shepherd of its requirement that he must contact his manager or Human Resources, use the Ethics Point Confidential reporting system, or call the ethics hotline to report discrimination or harassment in any way.

2.     Precision Drilling assigned Shepherd to work full-time on Rig 194. His shift would be twenty-eight days on work, followed by fourteen days off work. Rig Manager Robert

Bigham, Driller Kolby Henderson, and Derrick Hand Brandon Dexter supervised Shepherd during his employment by Precision Drilling. Shepherd was the only African American employee in his crew on Rig 194.

3.      Shepherd has long-standing personality problems that affect how he perceives reality and interacts with people. The Minnesota Multiphasic Personality Inventory narratives reflect that Shepherd is manipulative and hedonistic, has levels of suspiciousness and mistrust that are unusual, has hostility and paranoia of delusional proportions, and is also likely to be hyper-vigilant and often questions and mistrusts the motives of those around him.

4.      On August 13, 2013, while riding in a truck with Henderson and Lease Hand Nathan Chessher for his first day of work, Shepherd stated that he had gone to prison for murder. He then told Henderson not to disrespect him and that he would not disrespect Henderson. Both Henderson and Chessher were taken aback by these comments. Chessher believed Shepherd was trying to intimidate them. This encounter immediately soured the relationship between Chessher and Shepherd.

5.      During Shepherd's first days of work, Shepherd proved to be a smart, motivated, and capable employee. He arrived early every day and worked hard. Bigham and Henderson decided to promote Shepherd to the position of Motor Hand on August 25, 2010. Chesser was promoted to Floor Hand, and Precision Drilling hired Bobby Swindle to fill the Lease Hand position.

6.      Shepherd worked as a Motor Hand for the balance of his employment for Precision Drilling. As Motor Hand, Shepherd supervised Chessher and Swindle.

7.      Shepherd's attitude started to change shortly after the promotion, and on September 4, 2010, Bigham wrote him up for difficulty following directions and working well

with others. The decision to write up Shepherd was not influenced by his race or a desire to discriminate against him. Bigham also wrote up Chessher that same day because Chessher had difficulty staying awake at work and was not following orders.

8.      On September 4, 2010, after Shepherd and Chessher learned that they had been written up, the two men were working on the rig floor using chain tongs. When Chessher swung the tongs upward, he accidentally hit Shepherd in the head, splitting the skin above his eyebrow. Shepherd felt that Chessher acted intentionally, but he never reported his theory to anyone other than his girlfriend.

9.      Shepherd decided to go to the emergency room for medical care. Bigham drove Shepherd to the hospital, and during the drive, Bigham told Shepherd that if it was possible to treat the cut without sutures or pain killers, Shepherd should ask for that course of treatment so that the incident would not have to be reported to the Occupational Safety and Health Administration ("OSHA"). Bigham also stressed that he should get the treatment he needed. Bigham's comments regarding reporting to OSHA were not meant to scare Shepherd or intimidate him.

10.     At the hospital, Shepherd received four stitches, which meant that the incident would have to be reported to OSHA. All of Shepherd's medical treatment as a result of this injury was covered by Precision Drilling's Workers' Compensation insurance. Shepherd returned to work that night.

11.     On September 6, 2010, Shepherd talked to Bigham in the middle of a night shift because he was mad at Dexter, and he told Bigham that he was worried he was going to get in an altercation with Dexter if he did not leave immediately. Shepherd did not tell Bigham that he was angry with Dexter because Dexter used racial epithets or acted discriminatorily. Shepherd said

that Dexter was unreasonably hard on him, but Bigham believed that Dexter was hard on all of his employees because he had high standards. Bigham liked Shepherd and thought he was a good employee, so he wrote Shepherd's termination up as a request for a transfer to another rig closer to Hobbs, New Mexico, due to "personal reasons." Bigham also gave Shepherd high ratings on the work evaluation portion of the transfer sheet so that Shepherd would not encounter difficulty in obtaining a transfer. Bigham was under no obligation to do this, and he could have let Shepherd leave and then terminate him for job abandonment.

12.      Shepherd claimed at trial that he requested a transfer on September 6, 2010 because of unrelenting racial slurs and other racial harassment while working on the rig. Shepherd attended a Precision Drilling "Target Zero" training the day after requesting the transfer. While there, he talked with a Precision Drilling Human Relations employee named Shannon. Shepherd did not tell Shannon that he was experiencing racial discrimination or problems on the rig. After the training Shepherd decided not to wait for a transfer, and he returned to work on Rig 194.

13.      Todd Martin, who worked for Mann Welding as a Blow-Out Preventer ("BOP") tester, was present at the rig on two occasions to test the BOP valve.[1] On the second occasion, he allegedly heard a man he identified as a Driller, which would have been Henderson, comment that he would have "that nigger" get Martin's tools from his truck. He also allegedly heard the phrase "black ass" used about Shepherd. Later during the same day, Martin asked Henderson why Shepherd did not have a white hard hat, and Henderson allegedly replied that a "nigger" does not deserve a "white man's hard hat." This comment was made out of Shepherd's presence. Despite the fact that Martin was personally offended by this word, and despite the obviously

---

[1] It is not clear if this encounter happened before or after Shepherd returned from Target Zero training.

despicable connotations this word carries, Martin never reported hearing this word to anyone else but Shepherd.

14.     Martin admitted that after lost his job as a tester with Mann Welding, he asked Shepherd to help get him a position at QMax America, where Shepherd worked. Martin also admitted that he occasionally socialized with Shepherd.

15.      The issue of the color of his hard hat was of great import to Shepherd. Pursuant to Precision Drilling's safety policy, all new employees are given green hard hats. New employees who have more than one year of work experience in the drilling industry wear a green hard hat until either they have completed six months of employment or their Driller and Rig Manager agree that the employees are ready. The color of an employee's hard hat has no effect on the employee's pay or benefits, and new employees wearing green hats are not ridiculed or treated differently by their co-workers, except to the extent that they are given special assistance and direction.

16.     Shepherd worked for Precision Drilling for less than six months, and the position of Motor Hand was a complex and difficult job that involved a great deal of risk. When Shepherd complained to Bigham and Henderson about having to wear a green hard hat, they explained that he had to wear the hat pursuant to company policy. Although Shepherd was a good worker, Henderson did not believe that Shepherd was ready to have a white hard hat due to the difficulty of the Motor Hand position. Henderson never stated nor believed that Shepherd should not have a white hard hat because of his race.

17.     Shepherd complained once to Lukas Jankowski, the relief Rig Manager, about his green hard hat. Jankowski told him to discuss the matter with Bigham because he had no control over his hard hat. Shepherd did tell Jankowski that he thought that he was being discriminated

against because he was forced to wear the green hard hat, but Shepherd did not specify that the discrimination was due to race. Jankowski was genuinely perplexed at trial as to why he should have interpreted Shepherd's singular comment as an allegation that he was being denied a white hard hat because he was black.

18.    Martin's testimony regarding the hard hat issue directly conflicts with the testimony by Bigham, Henderson, and Jankowski. Given Martin's personal connection and indebtedness to Shepherd, he is not a wholly credible witness. I find the testimony of Precision Drilling's witnesses to be credible and genuine, and I conclude that Henderson did not use the words "black ass" and "nigger" in front of Martin, nor did he tell Martin that Shepherd did not deserve a "white man's hard hat."

19.    Tim Bryant was also a BOP tester for Mann Welding, and he worked occasionally on Rig 194. Bryant only met Shepherd once, and they talked for approximately fifteen minutes. Bryant testified that the Driller, Henderson, called out to Shepherd and asked what he was doing. He testified that he heard the Driller tell the "fucking nigger" to get back to work, but he did not know if Shepherd heard the comment. Bryant described the Driller as blond, over six feet tall, and lanky. Henderson is five foot seven inches, muscular, and has dark hair, so this description clearly does not match the Driller that Bryant allegedly overheard. Later Shepherd made an offhand comment that that description matches Brandon Dexter, but Bigham described Dexter as a stocky redhead, whose nickname was "Red." Due to the inconsistencies in Bryant's testimony, and its conflict with the statements made by more credible witnesses, I find that Henderson never used racial comments, let alone racial comments in front of Bryant.

20.    In December 2010, the rig moved from New Mexico to Big Spring, Texas, much further away from Shepherd's home.

21.     On the night of December 23, 2010, Shepherd was greasing the brake linkages, which are located underneath the rig floor. While he was working, Chessher started cleaning the rig floor with a hose, and water dripped under the rig floor and got Shepherd wet. Chessher did not know that Shepherd was underneath the floor at the time, and he did not hear Shepherd when he shouted at him to stop. Shepherd confronted Chessher about this incident, and Chessher told him that it was an accident.

22.     Shepherd left the rig floor to complain to Jankowski that Chessher had intentionally sprayed him with water. Jankowski immediately found Chessher and asked him what happened. Chessher explained that it was an accident, and Jankowski believed him. Jankowski gave Shepherd a coat to stay warm since the night was cold.

23.     Shepherd also reported the incident to Henderson, claiming that Chessher sprayed him intentionally. Shepherd did not tell Henderson that he believed Chessher sprayed him because he was black. Henderson did not believe it was intentional.

24.     Shepherd returned to Jankowski's trailer later than evening and requested a transfer because he could not work on the rig anymore. Jankowski did not have the authority to grant a transfer, which he told Shepherd; Jankowski only told Shepherd that he would contact the Field Supervisor to ask if this was an option. Jankowski explained that there was no guarantee that he would get a transfer. He offered to move Shepherd to another crew on the same rig, but Shepherd rejected the offer. Shepherd left the rig that night without completing his shift.

25.     The next morning, Jankowski contacted the field supervisor to inform him that Shepherd had left the rig in the middle of the night after requesting a transfer. When Bigham returned to the rig in January, he learned that Shepherd left after requesting a transfer but that the transfer was not possible. Bigham later signed Shepherd's termination paperwork. Shepherd

learned of his termination after attempting to use his medical insurance but discovered that his policy was no longer valid. When he called Precision Drilling's office to ask about his insurance, he was informed that he had been terminated for job abandonment.

26.     Shepherd was out of work for approximately two weeks before he went to work for his current employer, QMax America.

27.     Shepherd genuinely believes that he has been and continues to be discriminated against because of his race. He has strong opinions about race, and he repeatedly, to witnesses and to the Court, expressed his racist beliefs concerning the trustworthiness and motivations of non-black individuals. Shepherd's mistrust is so strong that he instructed his former girlfriend, Karen Pleasant, to avoid associating with her white best friend while they were dating.

28.     Shepherd has had a difficult and stressful past. He was a member of the Crips street gang and sold drugs for seven years; he was shot three times while in the gang; he shot and killed a member of the gang who he claims was threatening to kill him and spent more than ten years in prison as a result; he was involved in a high-speed car chase and collision, had to be cut out of the car using a "Jaws-of-Life," and was in a coma as a result of his injuries.

29.     The events and circumstances of his life have affected Shepherd. Dr. Parsons testified that Shepherd suffers from post-traumatic stress disorder ("PTSD"), depression, anxiety, and paranoia. Dr. Parsons testified that Shepherd's PTSD was exacerbated while working on Rig 194. However, he believed that his PTSD was not the result of his employment, and he could not say to what degree his employment exacerbated his symptoms. Dr. Parsons admitted that he did not review any educational records, medical records, mental health records or prison records for Shepherd and did not know significant details about Shepherd's past.

30.     Shepherd was the only person on the rig to bring up or discuss race. He often spoke with Bigham about his personal history and the nature of race in America, telling him that he was a "black man in a white man's world." Shepherd never told Bigham that he was being discriminated against because of race, nor did he describe specific incidents of racism.

31.     Shepherd would regularly complain to his girlfriend that he worked harder than the other crew members on the rig, but he never told her that crew members called him "nigger" or a "black ass." Pleasant and Shepherd would often fight when he would complain about his job because she thought that he was overreacting.

32.     Shepherd was and is very vocal and has no difficulty voicing his concerns. In fact, he frequently complained to Henderson about his work load. Shepherd also discussed race with Henderson, but he never complained of specific incidents of racism. Shepherd told Henderson that he was a "black man in a white man's world" and would frequently respond to requests made by Henderson with comments about race. Once Henderson asked Shepherd to clean the shed, and Shepherd stated, "It's because I'm black." Henderson told him, "No, it's because it's your job." Henderson admitted that Shepherd would generally complain about race, but he testified that there was absolutely no evidence to support his claims that he was being discriminated against because of his race.

33.     Shepherd never complained of discrimination to Precision Drilling's Human Resources Department, contacted the Ethics Point Confidential reporting system, or called 1-866-292-8632 to report discrimination, even though he was fully aware of these resources. Shepherd never told any of his supervisors that he had been called racial epithets.

9

34.     When Shepherd filed his Charge of Discrimination with the EEOC, he did not state that he was subject to racial slurs while on the rig, but instead claimed only that he "was made to do work that While Motormen did not have to do."

35.     Shepherd testified that he endured the racial discrimination and comments on the rig because he had to. This statement is belied by the following facts: 1) Shepherd has proven to be industrious and a hard worker, and has worked steadily at a series of better-paying jobs since he was released from prison in 2008; 2) Shepherd is very vocal about his beliefs, as he demonstrated both on the rig and during his testimony at trial; 3) Shepherd requested medical care, which made the September 4, 2010 incident reportable to OSHA, and told Bigham he was not going to take a scar for Precision Drilling; 4) Shepherd's statement the first day of work that he had served ten years in prison for murder and not to disrespect him; 5) while incarcerated in New Mexico, Shepherd filed two lawsuits against the Department of Corrections and others because he would not let them "trample my rights"; and 6) Shepherd told Chessher he planned to sue Precision Drilling to get the down payment for a rent house.

36.     Shepherd's supervisors and co-workers did not refer to Shepherd as "nigger" or "black ass," nor did they treat him differently because of his race.

37.     Shepherd did not have to perform more manual labor than white employees. He performed the amount of labor that was expected of a Motor Hand on that size of rig. Because of the fast-paced nature of the work on Rig 194, there were no scheduled breaks, and employees often ate on the job. Shepherd was able to and did frequently eat meals while he worked. He was never reprimanded for eating on the job.

38.     Shepherd was not fired because of his race. He was terminated for job abandonment.

10

CONCLUSIONS OF LAW

1.       **Motion to Amend Complaint.** Shepherd moved during the trial to amend his complaint to include a cause of action under 42 U.S.C. § 1981 in order to prevent the limitations on recovery that are inherent in a Title VII action. I grant this motion.

2.       **Counts I & III: Discrimination and Disparate Treatment Race Discrimination.[2]** It is unlawful to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (2006). To prevail on a claim of race discrimination, the plaintiff must show an adverse employment action occurred as a result of unlawful discrimination. *Adamson v. Multi Cmty. Diversified Servs.*, 514 F.3d 1136, 1151 (10th Cir. 2008) (citations omitted). Precision Drilling did not discriminate against Shepherd. Shepherd's supervisors did not use racial epithets, they did not require him to perform additional work, and they did not force him to do less desirable jobs. He was not denied breaks or food at any point. The color of Shepherd's hard hat solely reflected his status on the job, and in no way was it used to isolate or embarrass Shepherd. Since there was no unlawful discrimination, Counts I & III must fail.

3.       **Count II: Hostile Work Environment.** A hostile work environment is one in which the workplace is "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Bertsch v. Overstock.com*, 648 F.3d 1023, 1027 (10th Cir. 2012) (quotations omitted). While there was the use of rough and profane language on Rig 194, and while the rig members did not always get along, the work environment was not hostile within the

---

[2] Shepherd's claim for disparate treatment on account of his race is the same as alleging discrimination on the basis of race. This counts will be considered together.

meaning of Title VII. Racial epithets and remarks were not used, and there was no racial animus directed toward Shepherd. The color of Shepherd's hard hat was irrelevant outside of the context of safety awareness. Count II also fails.

4.      **Count IV: Retaliation.** I dismissed this claim on April 9, 2013, for failure to exhaust administrative remedies. (Doc. 76.)

5.      **Count V: Materially Adverse Employment Action.** This is not a separate cause of action under Title VII. Courts only consider whether there was a materially adverse employment action as one prong of several in an analysis of a retaliation claim. *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006); *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 803 (10th Cir. 2007); *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 533 (10th Cir. 1998).

6.      **42 U.S.C. § 1981 Claims.** "In racial discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §1981 . . . or Title VII." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (quoting *Baca v. Sklar*, 398 F.3d 1210, 1218 n.3 (10th Cir. 2005)). Shepherd has failed to prove his Title VII claims, and his § 1981 claims fail for the same reasons.

7.      **Costs.** Precision Drilling is entitled to the recoverable costs it incurred in defending this case.

_____
William P. Lynch
United States Magistrate Judge